**UNITED CHURCH OF THE MEDICAL CENTER, a religious corporation, Plaintiff-Appellant,**

**v.**

**MEDICAL CENTER COMMISSION, a body politic of the State of Illinois, Raymond J. Bayster, individually, and Rush Presbyterian-St. Luke's Medical Center, an Illinois not-for-profit corporation, Defendants-Appellees.**

**Nos. 81–2887, 82–1211.**

United States Court of Appeals, Seventh Circuit.

Argued June 3, 1982.

Decided Sept. 23, 1982.

Samuel W. Witwer, Jr., Witwer, Moran, Burlage & Atkinson, Chicago, Ill., for plaintiff-appellant.

Steven L. Bashwiner, Friedman & Koven, Chicago, Ill., for defendants-appellees.

Before PELL, Circuit Judge, GIBSON,[*] Senior Circuit Judge, and ESCHBACH, Circuit Judge.

PELL, Circuit Judge.

The appellant, United Church of the Medical Center (Church), brought suit under 42 U.S.C. § 1983, seeking preliminary and permanent injunctive relief from title reverter proceedings before the appellee Medical Center Commission (Commission), as well as declaratory relief. The district court denied preliminary injunctive relief on the ground there was not a sufficient showing that the threatened injury was immediate and irreparable. Subsequently the court dismissed the suit altogether on the ground that the Church had failed to exhaust its state administrative remedies. The Church appeals from both rulings in this consolidated appeal.

The Church contends the trial court erred in the following respects: (1) in finding that no immediate and irreparable injury warranted imposition of a preliminary injunction; (2) in its determination that the Commission was not a biased decisionmaker; (3) in finding that the Commission's

actions would create an unconstitutional interference with the Church's religious freedoms under the First Amendment; and (4) in dismissing the case for failure to exhaust state administrative remedies. Before turning to consider those questions, we repeat such findings of the District Court as are necessary for an understanding of our disposition of the case.

I.

The Church is an interdenominational community church affiliated with the United Methodist and United Presbyterian denominations. It is located in Chicago's near west side Medical Center District (District), and is the successor to a Methodist Church which had occupied the site adjacent to the Church's present site since approximately 1893.

The Commission is a statutory entity responsible for administering the Medical Center District, as defined by the Medical Center Act (Act). Ill. Rev. Stat. ch. 111½ § 5001–22 (1981). Both the District and the Commission were created by the legislature in 1949 for the purpose of establishing, monitoring, and expanding a medical center within the City of Chicago. Pursuant to that purpose, the Commission was given the power to acquire by eminent domain fee simple title to all real property in the District, with the exception of property owned by a religious organization and used for an exclusively religious purpose. *Id.* § 5004.

In 1959, after a long period of negotiation, the Commission deeded a parcel of land adjacent to St. Paul's Methodist Episcopal Church to St. Paul's I.M.C. Wesley Foundation (Foundation). The Foundation sought to build a center fulfilling its dual mission: extension of religious and spiritual services to students in the District, and provision of a program for the social, recreational, intellectual, cultural, and moral development of students. The deed was subject to a reversionary interest in the Commission, and provided that the title would

---

[*] Floyd R. Gibson, Senior Circuit Judge of the Court of Appeals for the Eighth Circuit, sitting by designation.

revest in the Commission if the Church ceased to use the property for the purposes set out in the Act. The purposes set out in the Act in this regard are quite general, and specify only that the Commission maintain the District to provide conditions most favorable to care and treatment of the sick, and of the study of disease. *Id.* § 5018.

The Foundation proceeded to build a new structure on the land, physically connected with St. Paul's. In 1967, the Foundation and St. Paul's decided that all activities would be conducted from the new building, and the old St. Paul's was razed. St. Paul's and the Foundation formally combined; the Foundation dissolved as a corporate entity; and its work was carried on by a successor, the Metropolitan West Side Parish, Inc., the appellant Church's immediate predecessor in interest.

In 1972, the Commission purchased the site of another church in the District, the Third Presbyterian Church. The ministry of that church was absorbed by the Church, which has operated interdenominationally since then, with both a full-time Methodist and a full-time Presbyterian minister on its staff. Since 1967 the Church has used the building for religious purposes in a public and open manner that was known to the Commission.[1] Since 1961, the Methodist Church has expended some $900,000 on Church operations.

Rush Presbyterian-St. Luke's Medical Center (Rush) is the largest hospital in the District. Rush has expanded rapidly over the past fifteen years, and the Commission has formally resolved to designate any available property in the District for ownership and use by Rush on the basis that ownership and use by Rush would be the best use of the property.

Rush sought to purchase the Church's property throughout the 1970's, but was continually rebuffed. It then turned to the Commission and urged adoption of a resolution condemning the former site of St. Paul's, now used as a parking lot, apparently on the theory that the property was no longer exempt under the "religious use" provisions of the Act. That condemnation proceeding is now pending in the state courts.

In April of 1980, the Commission adopted a resolution authorizing the title reverter proceeding which gave rise to the instant action, and appointing Raymond J. Bayster, the Commission's Executive Director, as hearing officer. That resolution, which did not specify charges of a particular non-use or disuse, stated in pertinent part:

"WHEREAS, at the regularly scheduled meeting of the Medical Center Commission a long discussion was had pertaining to the property located at 606–614 South Ashland Avenue and the consensus of the meeting was that the property was no longer being used for the purposes for which it had been conveyed, and there has been a disuse and a non-use of the property as pertaining to the original intent when the grant was made . . . .

. . . .

"NOW THEREFORE BE IT AND IT IS HEREBY RESOLVED that the General Counsel for the Medical Center Commission be and is hereby instructed to draw up charges pertaining to the following property . . . .

The Church thereafter filed the instant action, seeking a preliminary and permanent injunction of the reverter proceedings, on the ground that Bayster, as the hearing officer,[2] and the Commission are fatally biased, and a declaration that the Act is violative of due process to the extent it makes the Commission judge of its own

---

1.  There appears to be no question but that the Church is using the property for religious purposes, however, the Commission in the present case is proceeding under its reverter rights retained in the 1959 deed.

2.  On February 10, 1982, subsequent to the filing of the Church's original brief in this Court, the Commission granted Bayster's request to recuse himself as the designated hearing officer. We therefore do not need to consider the Church's contention that the Commission's Executive Director serving as the hearing officer compounded the inherent bias of the Commission in conducting proceedings to determine and implement its own reverter rights.

case in the reverter proceeding. Rush intervened as a party-defendant on the ground that it had an interest in the subject property which would not be adequately represented by the Commission. The trial court subsequently denied the Church preliminary injunctive relief, and thereafter dismissed the suit altogether, giving rise to this appeal. We first determine whether the district court properly dismissed the action, because if such dismissal was appropriate, it would be unnecessary for us to reach the Church's other claims. *See, e.g., Dempsey v. Guaranty Trust Co.,* 131 F.2d 103 (7th Cir. 1942), *cert. denied,* 318 U.S. 769, 63 S.Ct. 761, 87 L.Ed. 1139 (1943).

## II.

The district court granted the defendants' motion to dismiss on the ground that the Church was required to exhaust its administrative remedies under state law—i.e., go through the Commission's reverter proceeding—before resorting to federal court under section 1983. The court relied on *Rosenthal v. Bagley,* 581 F.2d 1258 (7th Cir. 1978), and *Adams v. Chicago,* 491 F.Supp. 1257 (N.D. Ill. 1980).

■ *Rosenthal,* however, was a proceeding before a federal agency, the CFTC, and recourse to the district court was not premised on a 1983 theory. The case therefore reflects concerns entirely different from those apposite to the instant case. Similarly in *Adams,* although one of the grounds of the plaintiffs' action was section 1983, the case was based on the City's alleged violation of CETA provisions, and therefore the plaintiffs had immediate recourse to a federal agency remedy. Because a party before a federal agency has immediate recourse to federal relief, it is not subject to the potential violations of its rights by persons acting under color of state law which was the concern which sparked

the enactment of section 1983, and imposition of an exhaustion requirement is appropriate. Federal agency proceedings are therefore governed by a strict exhaustion requirement that is simply inapplicable to state administrative proceedings. *See* Hart & Wechsler, The Federal Courts and the Federal System 985 (2d ed. 1973).

■ Since the District Court ruled in the instant case, the Supreme Court has issued its most comprehensive opinion to date on the exhaustion requirement in nonprisoner section 1983 cases, *Patsy v. Board of Regents,* —— U.S. ——, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). In a thorough analysis the Court held that exhaustion of state administrative remedies is not a prerequisite to bringing an action under section 1983.

In *Patsy,* the plaintiff brought a 1983 suit, alleging that her employer, Florida International University, had denied her employment opportunities based on her race and sex. The district court dismissed her claim on the ground she had failed to exhaust her state administrative remedies. The Fifth Circuit affirmed *en banc,* reversing a contrary panel ruling. The Supreme Court analyzed the legislative history of section 1983, and of 42 U.S.C. § 1997e (Supp. IV 1980), which imposed an exhaustion requirement in a limited class of prisoner cases. The Court determined on that basis that Congress did not intend the imposition of an exhaustion requirement, and that in the absence of such intent, it would be inappropriate for the Court to impose such a requirement.

■ *Patsy* is fully dispositive of the exhaustion question in the instant case. We conclude, therefore, that the district court erred in dismissing the case for failure to exhaust administrative remedies,[3] and turn

---

3. Rush raises for the first time in a Circuit Rule 11 letter commenting on the *Patsy* case the proposition that the present case is an appropriate one for abstention under the doctrine of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 639 (1971), as elaborated in a case decided the same day as *Patsy, Middlesex*

*County Ethics Comm. v. Garden State Bar Ass'n,* —— U.S. ——, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982). The *Middlesex County* Court imposed a threefold test for determining when extension of the *Younger* doctrine to noncriminal state proceedings would be appropriate: (1) are there ongoing state judicial pro-

to consider whether the court erred in denying preliminary injunctive relief.

### III.

The Church attacks the district court's failure to grant a preliminary injunction on two grounds. First, it contends that the legal basis of the court's ruling was in error, the court having incorrectly concluded that the hearing provisions of the Act are not unconstitutional. Second, it contends, the court abused its discretion in concluding that whatever harm would result from the alleged unconstitutionality was, in any event, too remote and speculative to constitute the requisite immediate and irreparable injury.

■■ Before turning to the substance of these challenges, we note preliminarily that the "universally accepted standard for the appellate test of a preliminary injunction is whether there was an abuse of discretion in granting or denying it." *Fox Valley Harvestore, Inc. v. A.O. Smith Harvestore Products, Inc.,* 545 F.2d 1096, 1097 (7th Cir. 1976). As this court has had occasion to remark, however, "to say that a district court may exercise discretion is not to say that such discretion is unreviewable. Discretionary choices 'are not left to a court's "inclination, but to its judgment; and its judgment is to be guided by sound legal principles." ' " *Ekanem v. Health & Hospital Corp.,* 589 F.2d 316, 319 (7th Cir. 1978) (quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 416, 95 S.Ct. 2362, 2370, 45 L.Ed.2d 280 (1975)). Furthermore, we have noted that the deference accorded the exercise of such discretion is enhanced when the decision is one which, unlike the decision under review, preserves the status quo. *Reinders Bros. v. Rain Bird Eastern Sales Corp.,* 627 F.2d 44, 49 (7th Cir. 1980). We therefore consider the Church's contention that the legal basis of the court's denial of the injunction was erroneous.

### A. Denial of Due Process

The Church asserts two bases for its contention that the reverter proceedings result in a denial of its due process rights under the Fourteenth Amendment. First, it contends that the reverter hearing provisions of the Act are unconstitutional on their face, because they deprive the Church of its due process right to have its case heard by a disinterested decisionmaker. Second, it contends the hearing provisions are unconstitutional as applied, because of the conflicts of interests of various commissioners, and various other indicia of prejudgment by the Commission. We turn first to the facial challenge to the statute.

### 1. The Facial Challenge to the Statute's Validity

Section 5009 of the Act provides that the conveyance contain a condition that in the event of violations of the restrictions as to the use of the property, the Commission shall have a public hearing and "upon a finding by the Commission" of violation, title shall revert to the Commission. Sections 5010–15 provided for the procedures to be followed in the hearing, and for re-

---

ceedings; (2) do the proceedings implicate important state interests; and (3) is there an adequate opportunity in the state proceedings to raise constitutional challenges. *Id.* 102 S.Ct. at 2522. In light of our determination that these proceedings were fatally infected under the rule of *Gibson v. Berryhill,* 411 U.S. 564, 577, 93 S.Ct. 1689, 1697, 36 L.Ed.2d 488 (1973), we conclude that the Church did not have an adequate opportunity to raise its federal constitutional challenges in the state proceedings, and need not consider the other two elements of the *Middlesex County* test. Furthermore we note, as the Commission's attorney conceded, just prior to Bayster's denial of all of the Church's constitutional motions at a prelimi-

nary Commission hearing on November 21, 1980:

> An administrative agency as such cannot determine the constitutionality of the statute under which it acts, and therefore, they shouldn't in any way be allowed to attack the constitutionality. You cannot or the agency cannot decide on whether the Act under which they operate is constitutional or not. All the agency does is enforce the Act.

Nor could such a challenge be raised on review in the state courts under the Act, which provides that only those grounds raised before the Commission may be urged or relied upon on review. Act at § 5020.

view of the Commission's decision under the provisions of the Illinois Administrative Review Act. There is no provision for compensation to the divested owner for the value of improvements that may have been placed on the property. The Act also provides that all money received by the Commission from the sale of such property "shall be paid into the State Treasury for deposit into the Medical Center Commission Income Fund." § 5020.

The Church contends that this scheme gives the Commission, which serves as the judge in the reverter proceedings, a direct financial stake in the outcome of those proceedings. It urges that under the rule of *Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973), and its progeny, such a mixing of functions violates the Church's due process rights to a disinterested decisionmaker under the Fourteenth Amendment.

In *Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973), licensed optometrists who were not members of the state optometric association were charged by that association with unprofessional conduct, because they were employed, rather than independent, practitioners. The association filed the charges with the state licensing board, all members of which were association members. The board had previously brought suit against the plaintiffs' employer and the plaintiffs, seeking to enjoin them from practicing optometry on similar grounds. The plaintiffs turned to the federal court under 42 U.S.C. § 1983, seeking injunctive relief from the board proceedings on the ground that the statutory delicensing scheme violated their due process rights under the Fourteenth Amendment.

The district court granted a preliminary injunction, finding that to require the plaintiffs to submit to the proceedings would deprive them of their property without due process, "and that irreparable injury would follow in the normal course of events." 411 U.S. at 571–72, 93 S.Ct. at 1694. The court found two bases of impermissible bias: (1) the Board's filing of the state court suit indicated prejudgment; and (2) because delicensing the plaintiffs would possibly redound to the personal benefit of the board members, they were disqualified. The Supreme Court affirmed on the basis of the latter ground only.

We are persuaded that under this analysis the reverter hearing provisions of the Act are similarly unconstitutional, because they give the Commission a stake in the outcome of the hearing. As the Supreme Court remarked in *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955):

> A fair trial in a fair tribunal is a basic requirement of due process. Fairness, of course, requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome.

In this case the Commission has a pecuniary interest in the outcome of the reverter proceedings, because if the Commission finds a nonuse or disuse, the property reverts to the Commission, without cost to the Commission even though the property has valuable improvements on it, and in the event of subsequent sale of the property, the proceeds redound to the coffers of the Commission. This is sufficient under the *Berryhill* rule to mandate disqualification of the Commission in the reverter proceeding, and require that the reverter proceedings provisions of the statute be held unconstitutional.[4]

Rush and the Commissioners attempt to distinguish this case from *Berryhill* on two grounds. First, they argue that there is no

---

4. Section 5021 of the Act provides:

    If any provision of this act is held invalid, such provision shall be deemed to be excised from this act and the invalidity thereof shall not affect any of the other provisions of this act. If the application of any provision of this act to any person or circumstance is held invalid, it shall not affect the application of such provision to persons or circumstances other than those as to which it is held invalid.

personal benefit to the Commission or the commissioners in the event of reverter. Second, they argue that because the Church accepted the property under the terms of the Act, it is now estopped to assert, or has waived, any challenge to the statute.

Neither factor distinguishes this case from *Berryhill.* As that Court pointed out, the disqualifying financial stake need not be "direct or positive." The Court cited *Ward v. Village of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), in which the Court found unconstitutional a procedure whereby a defendant was compelled to stand trial for traffic offenses before the mayor who was responsible for village finances, and whose court provided a substantial portion of village funds. Thus, as was pointed out in *Meyer v. Niles Township,* 477 F.Supp. 357, 362 (N.D. Ill. 1979), "[the] principle of disqualification applies even if the pecuniary interest is only an indirect outgrowth of a public official's desire to protect official funds."

Nor do we find estoppel or waiver in the Church's failure to object to the reverter proceedings provisions of the statute at the time it took the property under the statute. It would have been futile to have attempted to raise a challenge to those provisions in the courts at that time: such "assumed potential invasions," of due process rights are simply not justiciable in the absence of a concrete case or controversy. *See, e.g., Arizona v. California,* 283 U.S. 423, 462, 51 S.Ct. 522, 528, 75 L.Ed. 1154 (1931). We further note that the *Berryhill* plaintiffs were not required to have protested the Board's delicensing procedures when they received their optometry licenses. We will not impose such a requirement where the Supreme Court did not see fit to do so. Furthermore, the terms of the Act have been amended since the Church took its

deed, and now provide the Commission with greater authority to retain and spend the money generated by a sale of property. Act of Sept. 19, 1980, 81–1495, § 2, 1980 Ill. Laws 2522, 2523–24. This enhancement of the Commission's financial stake in the proceedings was not present when the Church took its deed, and therefore it could not have sufficiently foreseen the statute's current degree of constitutional debility for us now to require any challenge at the time of purchase.

We conclude, therefore, that those provisions of the Act which make the Commission the judge of whether property shall revert to it for non-use or disuse violate the standards of due process as set forth in *Gibson v. Berryhill* in light of the Commission's dual status as judge and a party interested in the outcome of the proceedings. In simple terms the particular evil is that the Act permits the Commission to award valuable property to itself without compensation and without due process. We do not, therefore, reach the question unreached by the Supreme Court in *Berryhill,* whether sufficient indicia of prejudgment can also rise to the level of a violation of due process, and whether such indicia rose to the requisite level in the instant case.[5] We turn rather to consider whether the district court abused its discretion in holding that because the Commission had not yet found that the Church had violated the conditions under which the property was deeded, no immediate and irreparable injury had occurred, and no preliminary relief was warranted.

### B. Immediate and Irreparable Harm

The trial court implicitly rejected our conclusion above, and dealt only with the Church's second challenge to the constitutionality of the reverter proceedings provi-

---

5. The Church also claims that the Commission's inquiry whether the Church's work appropriately serves the purposes of the Act would violate its First Amendment rights under *NLRB v. Catholic Bishop,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). In light of our disposition of the case we do not reach that question, but note merely that courts have long

distinguished between inquiries which probe the beliefs of a religious organization, and those which evaluate its conduct. *See, e.g., Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Theriault v. Carlson,* 495 F.2d 390 (5th Cir. 1974), *cert. denied,* 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279.

sion, i.e., that the Commission had prejudged the case, and thus that the statute was unconstitutional as applied. While the court noted that some indicia of prejudice cited by the Church were "troublesome," it concluded that the plaintiff's feared injury remained prospective.[6] It therefore ruled that "[p]laintiff has not carried its burden of persuasion that its threatened injury is immediate and irreparable, and accordingly the extraordinary remedy of a preliminary injunction is not appropriate at this time."

We find the court abused its discretion in denying the preliminary injunction, first, because the legal basis of that denial was in error. As set forth above, we have concluded that requiring the Church to submit to the Commission's hearing procedures would deprive it of its right to due process under the Fourteenth Amendment. We also conclude the court abused its discretion in concluding that submission to the Commission's proceeding did not constitute sufficient injury to warrant preliminary relief.

Submission to a fatally biased decisionmaking process is in itself a constitutional injury sufficient to warrant injunctive relief, where irreparable injury will follow in the due course of events, even though the party charged is to be deprived of nothing until the completion of the proceedings. *Gibson v. Berryhill,* 411 U.S. at 571–72, 574–75, 93 S.Ct. at 1694, 1695–96. This is not a case like *Reichenberger v. Pritchard,* 660 F.2d 280 (7th Cir. 1981), where the plaintiffs alleged that a lawfully constituted decisionmaking body would at some future date deprive it of its rights at the unconstitutional behest of other parties. Rather the precise violation claimed here is the subjection to an unconstitutionally constituted decisionmaker. That injury has already occurred, and is therefore sufficiently "immediate" to warrant injunctive relief.

We are also persuaded that the injury is irreparable. The district court apparently based the contrary conclusion upon a determination that any damage resulting

from the action of the Commission could be remedied by resort to review of the Commission's decision in the courts, as provided for in section 5015 of the Act. The claim that this avenue of relief is initially exclusive is also foreclosed by the *Berryhill* case, which specifically noted that judicial review of biased state administrative proceedings, even if on a de novo basis, does not obviate the need for injunctive relief. 411 U.S. at 577, 93 S.Ct. at 1697. *See Ward v. Village of Monroeville,* 409 U.S. 57, 61–62, 93 S.Ct. 80, 83–84, 34 L.Ed.2d 267 (1972) ("Nor . . . may the State's . . . procedure be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication. Petitioner is entitled to a neutral and detached judge in the first instance.").

Rush also suggests that the Church would have a monetary remedy if it were to lose before the Commission, and that its injury is not therefore irreparable: "Very simply, the harm would consist of the relocation of [the Church's] ministry to another site and the costs incident to that relocation." It is settled beyond the need for citation, however, that a given piece of property is considered to be unique, and its loss is always an irreparable injury. Substitution of another piece of property cannot cure the loss of one's property by an unconstitutional procedure.

We conclude, therefore, that the Court abused its discretion in denying preliminary injunctive relief. For all the foregoing reasons, the judgment appealed from is reversed and remanded to the district court for further proceedings in accord with this opinion.

REVERSED AND REMANDED.

---

**6.** We do not find it necessary to give any weight to the strong inference in the record that the Commission has determined to reac-

quire full title to this real estate, come what may.